THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------
WILLIAM N. BERNARD and THE WILLAM N.                    No. 16 CV
BERNARD AND CATHERINE H. BERNARD
REVOCABLE LIVING TRUST,

                         Plaintiffs,

    - against -                                           COMPLAINT

LEONARD VINCENT LOMBARDO;
THE LVG HOLDING COMPANY D&L #1200 LLC;
THE LEONARDVINCENT GROUP, INC.;
BRIAN A. HUDLIN; DANIEL GAMBINO
and LOUIS M. LOMBARDI,

                         Defendants.
---------------------------------------------------------------

      Plaintiffs William N. Bernard and The William N. Bernard and Catherine H. Bernard

Revocable Living Trust (the "Trust"), through their attorneys Willens & Scarvalone LLP, allege

on the basis of Mr. Bernard's personal knowledge, as follows:

<u>SUMMARY OF THE ACTION</u>

      1.  Mr. Bernard and the Trust bring this action to recover approximately $1.5 million

stolen by the defendants through a fraudulent scheme designed to separate an elderly couple

from their life savings.

      2.  Defendant Leonard Vincent Lombardo (a/k/a "Leonard Vincent" and "Leonardo

Lombardo") is a serial offender with a long history of securities fraud.  In 2001, he was barred

from the securities industry by order of the National Association of Securities Dealers for using

fraudulent misrepresentations and omissions to sell risky stocks to customers seeking safe,

reliable investments – the same type of misconduct described below.

      3.  Since the exclusion order in 2001, Lombardo has created a labyrinth of shell

companies to mask his continued involvement in the securities industry.  Among other ventures, he created The LeonardVincent Group, a purported real estate management company, and an investment vehicle called The LVG Holding Company D&L #1200 LLC ("LVG Holding"). Using fraudulent offering materials and other false documents, Lombardo and his co-conspirators Brian Hudlin, Daniel Gambino and Louis Lombardi solicited investments in LVG Holding.  Their primary target was the plaintiff, William Bernard.

4.   Starting in October 2012, Mr. Bernard made a series of investments in LVG Holding. In each case, he signed a subscription agreement promising that he would receive "Preferred Class A shares" paying a fixed interest rate.  In reliance on this promise and many others, Mr. Bernard continued to send money to LVG Holding until April 2014.  By that time, his total investment was $1.5 million.  He was, and remains, the only major investor in defendants' venture.

5.   Defendants made outrageous false statements and egregious omissions in the written material that they sent to Mr. Bernard, as alleged in detail below.  Most important, they went to great lengths to hide the fact that Lombardo was the mastermind of the corporate defendants, including LVG Holding.  Lombardo and his co-conspirators knew that no one would invest in their venture if they disclosed Lombardo's role, so they omitted his name from the list of managers in the offering materials for the holding company.  They also used his aliases "Leonard Vincent" and "Leonardo Lombardo" in documents provided to Mr. Bernard.

6.   In 2014, LVG Holding stopped making payments and Mr. Bernard demanded that defendants return his investment.  Defendants, including Lombardo, acknowledged the debt to Mr. Bernard and promised to repay his investment.  In a restructuring agreement dated October 30, 2014, LVG Holding agreed to pay Mr. Bernard the amount of $1,594,500 in 24 monthly

payments of $25,000 beginning on December 4, 2014, followed by a balloon payment of $994,500 in December 2016.

7.  Almost immediately, defendants breached the restructuring agreement.  They made one payment of $25,000 to Mr. Bernard in November 2014, followed by sporadic payments of lower amounts in 2015.  Mr. Bernard repeatedly demanded payment of principal and interest but defendants have failed to make any payments since October 2015.  The balance due exceeds $1.5 million.

8.  Plaintiffs bring this action for a judgment under the federal securities laws and the common law to recover the funds that they invested with defendants and the interest on those funds that defendants repeatedly promised, in writing, to pay him.

## THE PARTIES

9.  Plaintiff William N. Bernard is an 87-year-old citizen of the State of Minnesota.  He resides at 100 Promenade Avenue, Wayzata, Minnesota 55391.

10. Plaintiff The William N. Bernard and Catherine H. Bernard Revocable Living Trust is a trust duly organized in the State of Minnesota.  Mr. Bernard is a trustee who is authorized to invest the funds of the Trust.

11. Defendant Leonard Vincent Lombardo is a citizen of the State of New York.  He resides at 33 Scott Drive, Melville, NY 11747.  He began his career in 1993 with Stratton Oakmont, Inc., the boiler-room brokerage made famous in the "Wolf of Wall Street" movie.  He is the principal and controlling member of The LeonardVincent Group and LVG Holding.

12. On June 5, 2001, an Extended Hearing Panel of the NASD held that Lombardo engaged in "(1) material misrepresentations and baseless and improper price, profit, and performance predictions, involving a number of specific customers, and (2) several unauthorized

transactions." He offered "speculative and risky" stocks and made false statements to customers about the business plans of the issuing companies. In particular, "Lombardo omitted telling the customers anything negative about the companies involved," including their limited operating history and precarious financial condition. Finding that Lombardo committed egregious violations of the securities laws and acted with reckless disregard for his customers, the NASD panel permanently barred Lombardo "from associating with any member of the Association in any capacity" – effectively, a lifetime ban from employment in the securities industry.

13. Defendant The LeonardVincent Group Inc. is a Delaware corporation registered to do business in New York State, with offices at 14 Wall Street, 20th Floor, New York, NY 10005 and 3500 Sunrise Highway, Suite T111, Great River, NY 11739.

14. On March 21, 2013, the enforcement bureau of Pennsylvania's Department of Banking and Securities issued a Cease and Desist Order against The LeonardVincent Group and defendant Hudlin. The bureau found that The LeonardVincent Group and Hudlin caused an affiliated company, LVG Holding #1255 LLC, to violate Pennsylvania's securities laws by offering unregistered securities. On October 21, 2014, The LeonardVincent Group and Hudlin entered a consent decree and accepted costs and sanctions for this conduct.

15. On information and belief, the Pennsylvania Cease and Desist Order was based on a fraudulent investment scheme that was essentially identical to the scheme described in this complaint. The fraudulent Confidential Private Offering Memorandum and Subscription Agreement that The LeonardVincent Group and Hudlin provided to potential investors in Pennsylvania were essentially the same as the documents that defendants provided to plaintiff William Bernard, as described below.

16. Defendant The LVG Holding Company D&L #1200 LLC is a New York limited

4

liability company with offices at 14 Wall Street, 20th Floor, New York, NY 10005 and 3500 Sunrise Highway, Suite T111, Great River, NY 11739.

17.   Defendant Brian A. Hudlin is a citizen of the State of New York, residing at 14 Pine Meadow Place, Commack, New York 11725.  He is one of the managers of LVG Holding who made many of the material false statements and misrepresentations to Mr. Bernard, as alleged below.  He is also the Chief Executive Officer of defendant The LeonardVincent Group.  The enforcement bureau of Pennsylvania's Department of Banking and Securities found that Hudlin caused both LVG Holding and The LeonardVincent Group to offer unregistered, non-exempt securities in violation of applicable laws, and to make false statements about those securities to potential investors.

18.   Defendant Daniel Gambino is a citizen of the State of New York, residing at 21 Deeringwood Lane, Babylon, New York 11702.  From June 2012 until early 2015, he was a Manager of LVG Holding and, according to a business card that he provided to Mr. Bernard, also a Fund Manager of The LeonardVincent Group.  The business card states that The LeonardVincent Group provides "property management and consulting services" in New York, San Francisco, London, Dubai, Dallas and Miami Beach.

19.   Defendant Louis M. Lombardi is a citizen of the State of New York, residing at 201 Caswell Avenue, Apt. 293, Staten Island, New York 10314.  He was a Manager of LVG Holding from approximately April 2013 to early 2015.  During that period, he acted as LVG Holding's Senior Portfolio Construction Manager and Property Acquisition Director.  Mr. Lombardi was a registered broker-dealer who worked for at least two firms that were expelled by the Financial Industry Regulatory Authority ("FINRA").  He was temporarily suspended and fined by FINRA in 2014 for failing to report a personal bankruptcy filing.

20. LVG Holding is a shell corporation operated by the other defendants for their own benefit. In addition to LVG Holding, the defendants created several other shell corporations for their fraudulent investment schemes, including The LVG Holding 1255 LLC, LVG Holding 1355 Inc., The LVG Capital Growth Portfolio Inc., and LJL Holding Corporation.

21. Leonard Vincent Lombardo operated LVG Holding, The LeonardVincent Group and the other shell companies as a single entity without regard for the formalities of corporate organization. For example, according to documents obtained by plaintiffs, The LeonardVincent Group is the owner of many properties purchased with plaintiffs' funds, but LVG Holding is the borrower on the mortgages for those properties.

22. From its inception, LVG Holding has been dominated and controlled by the other defendants and has not existed as a separate corporation serving the interests of its investors, including plaintiffs.

<u>JURISDICTION AND VENUE</u>

23. This action arises under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction pursuant to Section 22 of the Securities Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1331, 28 U.S.C. § 1332 and principles of supplemental jurisdiction, 28 U.S.C. § 1367(a).

24. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because all of the defendants reside in the State of New York. The corporate defendants reside in the Southern District of New York pursuant to 28 U.S.C. § 1391(c)(2). The Confidential Private Offering Memorandum provided by defendant LVG Holding to Mr. Bernard states: "The principal executive offices of the Company are located at 14 Wall Street, 20th Floor, New York, New York 10005" in this District.

25.  The defendants have also made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.  Among other things, defendants made fraudulent statements to plaintiffs by mail, telephone, and fax originating in this District.

<u>DEFENDANTS' FRAUDULENT OFFER AND SALE OF SECURITIES</u>

26.  Beginning in or around June 2012, Lombardo and the other individual defendants solicited investments in LVG Holding.  From that time through at least 2013, defendants conducted a continuous, unregistered offering of interests in LVG Holding.

27.  Defendants employed a salesman named Thomas Dunn.  Before joining LVG Holding, Dunn was a securities broker for Rockwell Global Capital and Garden State Securities.  One of his clients was the plaintiff, William Bernard.

28.  On behalf of his employer, LVG Holding, Dunn called Mr. Bernard in or about September 2012.  The telephone call originated in New York City and reached Mr. Bernard in Minnesota.  Dunn told Mr. Bernard that LVG Holding was offering interests in a real estate portfolio consisting of high-quality residential properties in Connecticut.

A.  <u>The Fraudulent Offering Documents</u>

29.  Shortly after that call, LVG Holding sent a package of material to Mr. Bernard describing the proposed investment.  The material included a Confidential Private Offering Memorandum purporting to offer up to $5 million in "membership units" in LVG Holding; an Operating Agreement for LVG Holding, dated October 10, 2012; and an undated glossy brochure describing the defendant The LeonardVincent Group.

30.  At various times in 2012 and 2013, LVG Holding delivered at least three revised

versions of the Confidential Private Offering Memorandum, all dated June 20, 2012.  Unlike the
original Offering Memorandum, the new versions offered up to $500,000 of "Class A Units"
paying a fixed interest rate.  The Membership Units described in the original Offering
Memorandum were reclassified as "Class B Units" that would purportedly share in the profits of
the company but would not earn interest.

31.  LVG Holding mailed the supplemental offering memoranda from its offices in New
York State to Mr. Bernard's office in Minnesota.  These documents contained numerous material
false statements and misleading omissions, as specifically alleged below.

32.  At the time of each investment, LVG Holding provided an executed Subscription
Agreement to Mr. Bernard.  In each Subscription Agreement, LVG Holding agreed to sell a
specified number of Class A Units to Mr. Bernard at a price of $10 per unit.  It also promised to
deposit Mr. Bernard's funds in an "Investment Holding Account" at JP Morgan Chase Bank.

33.  LVG Holding sent Mr. Bernard a "Distribution Breakdown Sheet" that identified the
interest rate and monthly payment for each investment.  For example, the Distribution
Breakdown Sheet dated November 1, 2013, confirms Mr. Bernard's purchase of 10,000 Class A
Units at $10 per unit, at an annual "yield" of 12.5%, with monthly interest payments of
$1,041.00 to be paid on the 5th of each month.

34.  LVG Holding mailed each Subscription Agreement and Distribution Breakdown
Sheet from its offices in New York State to Mr. Bernard's office in Minnesota.  The Subscription
Agreements and Distribution Breakdown Sheets contained numerous material false statements
and misleading omissions, as specifically alleged below.

35.  On or about January 8, 2013, LVG Holding delivered an amended Operating
Agreement to Mr. Bernard.  LVG Holding mailed the amended Operating Agreement from its

offices in New York State to Mr. Bernard's office in Minnesota. The amended Operating Agreement contained numerous material false statements and misleading omissions, as specifically alleged below.

36. Defendants knowingly made these material false statements and misleading omissions to induce Mr. Bernard to invest in LVG Holding. They failed to disclose their past misconduct, their lack of experience in the real estate industry, their lack of financial resources and other material facts, including Leonard Vincent Lombardo's participation in the venture. They knew that Mr. Bernard would reject their offer if he knew the truth.

37. In reliance on these material false and fraudulent statements and omissions, Mr. Bernard made a series of investments in LVG Holding for himself and on behalf of the Trust, *see* paragraphs 69-70, *infra*.

38. As a condition of his investment, defendants required plaintiffs to warrant to LVG Holding that they would not disclose or distribute the Offering Memorandum to anyone.

B.  Specific False Statements and Misleading Omissions

    i.  The Original Offering Memorandum, June 2012

39. The Offering Memorandum (at pages 25, 33) states that LVG Holding is managed by three people: defendants Hudlin, Gambino and Lombardi. This statement is false and misleading because it fails to mention that defendant Leonard Vincent Lombardo was, and remains, the true director of LVG Holding.

40. The Offering Memorandum (at page 35) also states that The LeonardVincent Group will "advise the Management team in making appropriate decisions and taking effective action." This statement was false and misleading because it fails to disclose that defendant Leonard Vincent Lombardo was, and remains, the true director of The LeonardVincent Group  and LVG

Holding, and that he controls and makes all material decisions on behalf of both companies.

41.  The Offering Memorandum (at page 25) states: "Our company is at the forefront of Real Estate Investment on foreclosed housing, therefore we are able to aggressively buy these houses in bulk directly from the bank."  This statement was false.  In fact, according to documents obtained by plaintiffs, defendants used plaintiffs' funds to purchase properties that were not in foreclosure, and bought those properties from individual sellers, not from banks.  Defendants did not receive the advantageous prices that would be expected if they had purchased foreclosed properties 'in bulk' directly from banks.

42.  The Offering Memorandum (at page 25) states: The company plans a "sophisticated marketing campaign detailed in our business plan."  This statement was false.  Defendants have not planned or undertaken any marketing campaign and they did not plan to provide, or provide, a business plan to Mr. Bernard.

43.  The Offering Memorandum (at page 25) states: "Our properties are top quality and unique in nature."  The statement was false.  Many of the properties purchased by defendants are poor-quality residences located in crime-ridden or blighted neighborhoods.

44.  The Offering Memorandum (at page 30) states: "The Units are being offered for sale in reliance upon certain exemptions from the registration requirements of the Securities Act, applicable New York Securities Laws, and other applicable state securities laws."

45.  This statement was false.  Under New York law, real estate securities must be filed with the Office of the Attorney General, and it is illegal to offer or sell such securities before the Attorney General issues a letter stating that the offering has been filed.  N.Y. Gen. Bus. Law § 352-e.  Defendants knew that the units in LVG Holding were real estate securities and that the offering was not exempt from the registration requirements of New York, Pennsylvania and

other states.

46.  The Offering Memorandum further provides that "purchasers may seek rescission of the purchases of the Units" if the offering is not exempt from registration.

47.  The Offering Memorandum (at page 35) states: "The company has established a Board of Advisors, which includes highly qualified business and industry professionals."  This statement was false.  LVG Holding has never had a board of advisors.

ii.  The Original Operating Agreement, June 2012

48.  The Operating Agreement (section 7.4) states: "A Capital Account shall be established and maintained for each Member" that will record "such Member's Capital Contributions, such member's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to this Agreement."   This statement was false. Defendants did not plan to establish, and never did establish, a capital account for Mr. Bernard.

49.  In late 2015, Leonard Vincent Lombardo contacted Mr. Bernard by telephone and asked him to prepare a statement of his own investments in LVG Holding.  It was apparent to Mr. Bernard that defendants had failed to maintain records of his interest in the company.

50.  The Operating Agreement (section 10.2) states: "[T]he Managers shall maintain records and accounts of all operations and expenditures of the Company," including tax returns and financial statements for the most recent three years.  This statement was false.  Defendants did not plan to maintain, and have not maintained, the records and accounts required for a properly functioning real estate holding company, and have not prepared tax returns or financial statements.

51.  The Operating Agreement (section 10.2) states: "The books and records shall at all times be maintained at the principal office of the Company and shall be open to the reasonable

inspection and examination of the Members, or their duly authorized representatives during reasonable business hours." This statement was false. Defendant did not plan to make available, and have not made their books and records available to Mr. Bernard or his representatives, despite numerous requests.

52. The Operating Agreement (section 10.3) states that the managers will prepare and file "timely tax returns" and that "copies of such returns, or pertinent information therefrom, shall be furnished to the Members with a reasonable time after the end of the Company's fiscal year." This statement was false. Defendants did not plan to file, and have not filed, tax returns as required by state and federal law, and no tax returns have been furnished to Mr. Bernard at any time.

53. Most surprising, the Operating Agreement (section 4.2) states that the three managers of LVG Holding are Hudlin, Gambino and "Leonardo Lombardo" – an alias of defendant Leonard Vincent Lombardo. This statement was false and misleading because it failed to identify Lombardo by his real name. In all of their written materials, defendants deliberately omitted Lombardo's name and concealed his role in defendants LVG Holding and The LeonardVincent Group.

iii.  The Revised Operating Agreement, January 8, 2013

54. LVG Holding revised its operating agreement on or about January 8, 2013, and sent the new agreement to Mr. Bernard in early 2013.

55. The revised operating agreement states (at page 1): "The Company shall initially have three (3) Managers: Brian Hudlin, Daniel Gambino, Louis Lombardi." This statement was false and misleading because it fails to disclose that defendant Leonard Vincent Lombardo was, and remains, the true director of The LeonardVincent Group  and LVG Holding, and that he

controls and makes all material decisions on behalf of both companies.

56.  Defendants first identified a fictional person named "Leonardo Lombardo" as manager and then revised the operating agreement to name defendant Louis Lombardi as the third "initial" manager.  This unexplained revision of the operating agreement clearly demonstrates that defendants were attempting to hide the key role of Leonard Vincent Lombardo in their enterprise.

57.  In February 2014, FINRA fined and temporarily suspended defendant Lombardi from the securities industry.  Defendants failed to disclose that regulatory action to plaintiffs.

58.  In late 2014 or early 2015, defendant Leonard Vincent Lombardo fired defendants Lombardi and Gambino as managers of LVG Holding.  Lombardo said that he could not afford to pay their salaries.  Defendants failed to disclose the termination of Lombardi and Gambino to plaintiffs, even though the Offering Memorandum states that the loss of any one of the original managers "could have a material adverse effect on the Company."

59.  Defendants also failed to disclose that, on March 21, 2013, the enforcement bureau of Pennsylvania's Department of Banking and Securities issued a Cease and Desist Order against defendants The LeonardVincent Group and Hudlin, and that, on October 21, 2014, those defendants entered a consent decree and agreed to sanctions for offering unregistered securities.

iv.  <u>The LeonardVincent Group Brochure</u>

60.  Before his first investment in October 2012, defendants mailed a glossy 22-page brochure to Mr. Bernard title "The LeonardVincent Group."  The purpose of this brochure was to convince Mr. Bernard that his investment would be managed by a substantial and experienced company.

61.  The brochure identifies a "Management Team" consisting of three men: defendant

Hudlin, Robert Rush and Mike Buttner.  This description is false because, in fact, Leonard

Vincent Lombardo was at all times relevant to this complaint the director of The LeonardVincent

Group.  The brochure never discloses this fact and never mentions Lombardo.

62.  The brochure states (at page 3):  "The Group maintains strong and expanding

affiliations with domestic and global strategic partners."   This statement was false in 2012 and at

all times to the present.  The LeonardVincent Group never had strategic partners, or any

affiliations outside the United States.

63.  The brochure states (at page 13):  "We anticipate hiring 2,000 to 2,500 persons to

deploy in our sales departments, accounting department, property management division, as well

as in our construction and development departments."  This statement was false in 2012 and at

all times to the present.  The LeonardVincent Group never had any plans to hire more than a

handful of employees, and never formed the five divisions or departments described in this

sentence.

64.  In addition to these false statements, The LeonardVincent Group also used its

brochure to undertake a fiduciary duty to act for the benefit of its clients, including plaintiffs.

For example, the brochure states (at page 3):

> [B]y enhancing the profitability of our real estate ventures *for our clients*, we can provide
> the greatest benefits *for the collective interests of our clients* and The LeonardVincent
> Group.  Our mission is to tap our experience and cumulative wisdom *to guide our clients*
> down rewarding paths that will justify placing trusts and confidence in our firm.

65.  In its brochure (at pages 15 and 21), The LeonardVincent Group offered a

"specialized consulting division" offering to analyze the risks, taxation and value "of our

customers' holdings."  It also offered "the assistance of professionals" and promised that clients

would be "guided by the experience and wisdom of expert practitioners."

66.  Together these promises created a fiduciary duty for the defendants to act on behalf

of their investors, including plaintiffs, and led plaintiffs to put their trust and confidence in defendants.

    v.  <u>The Subscription Agreements</u>

    67.  The subscription agreements and distribution breakdown sheets incorporate the offering documents described above, by asking Mr. Bernard to certify that he received and read them before purchasing units in LVG Holding.

    68.  In addition, the subscription agreements and distribution breakdown sheets contain the following material false statements and omissions:

    a.  Audited financial statements "will be made available" to investors "no later than June 1, 2013." In fact, defendants have never made any financial statements available to investors.

    b.  The distribution breakdown sheet dated April 12, 2013, states that Mr. Bernard will receive a yield of 11.25% on his investment of $300,000. In fact, Mr. Bernard has not received monthly payments on this investment and his annual yield is far below 11.25%.

    c.  The distribution breakdown sheet dated May 31, 2013, states that Mr. Bernard will receive a yield of 11.25% on his investment of $50,000. In fact, Mr. Bernard has not received monthly payments on this investment and his annual yield is far below 11.25%.

    d.  The distribution breakdown sheet dated June 28, 2013, states that Mr. Bernard will receive a yield of 11.25% on his investment of $100,000. In fact, Mr. Bernard has not received monthly payments on this investment and his annual yield is far below 11.25%.

e.  The distribution breakdown sheet dated August 29, 2013, states that Mr. Bernard will receive a yield of 12.5% on his investment of $300,000 in monthly payments of $3,125.  In fact, Mr. Bernard has not received monthly payments on this investment and his annual yield is far below 12.5%.

f.  The distribution breakdown sheet dated November 1, 2013, states that Mr. Bernard will receive a yield of 12.5% on his investment of $100,000 in monthly payments of $1,041.  In fact, Mr. Bernard has not received monthly payments on this investment and his annual yield is far below 12.5%.

g.  The distribution breakdown sheet dated April 3, 2014, states that Mr. Bernard will receive a yield of 11.25% on his investment of $200,000 in monthly payments of $1,875.  In fact, Mr. Bernard has not received monthly payments on this investment and his annual yield is far below 11.25%.

h.  The distribution breakdown sheet dated April 28, 2014, states that Mr. Bernard will receive a yield of 12% on his investment of $300,000 in monthly payments of $3,000.  In fact, Mr. Bernard has not received monthly payments on this investment and his annual yield is far below 12%.

C.  Mr. Bernard's $1.5 Million Investment

69.  In reliance on defendants' false and fraudulent statements and omissions, Mr. Bernard purchased interests in LVG Holding by mailing checks to the company's office in New York State, as follows:

a.  Check number 2165, dated October 26, 2012, for $2,500.00.

b.  Check number 2229, dated February 26, 2013, for $146,250.00.

c.  Check number 2248, dated April 11, 2013, for $150,000.00.

    d.   Check number 12430, dated May 6, 2013, for $100,000.00.

    e.   Check number 2259, dated June 1, 2013, for $50,000.00.

    f.   Check number 2268, dated June 26, 2013, for $100,000.00.

    g.   Check number 2275, dated July 31, 2013, for $50,000.00.

    h.   Check number 2313, dated November 1, 2013, for $100,000.00.

    i.   Check number 2349, dated February 3, 2014, for $200,000.00.

    j.   Check number 2382, dated May 7, 2014, for $300,000.00.

70.  In reliance on defendants' false and fraudulent statements and omissions, on April 1, 2014, Mr. Bernard transferred $300,000 to LVG Holding by moving funds held in an Individual Retirement Account to an account held by AdvantaIRA Trust, LLC.  The sole asset of the Advanta account is 30,000 Class A Units of LVG Holding.

D.  <u>Defendants' Failure to Honor Their Repayment Obligations</u>

71.  Defendants made monthly payments to plaintiffs in various amounts from January to July 2014.  They failed to make any payment to plaintiffs in August, September and October 2014.

72.  The total amount paid by defendants in 2014, $82,687.50, was far below the amount due to plaintiffs under the subscription agreements.

73.  On September 18, 2014, Mr. Bernard sent a letter by fax to LVG Holding and The LeonardVincent Group.  He stated: "We have not received any monthly payments since July 9 . . . .  Upon reflecting on this with my spouse, we elect to get our funds ASAP."

74.  On October 20, 2014, Mr. Bernard sent a letter by fax to LVG Holding and The LeonardVincent Group.  He stated: "We never received any notice that the yield on both of [plaintiffs'] accounts were going to zero.  These funds are necessary inasmuch as my office is

about to close and we need this for living expenses."

75.  On October 28, 2014, Mr. Bernard sent a letter by fax to defendants.  Using an

acronym for The LeonardVincent Group, he stated: "If TVLG is having trouble I want out

inasmuch as we cannot tolerate losses or delays anymore due to our age and fact our office is no

longer producing. . . .  We have never received a statement on TLVG so I have no idea how you

are doing.  If the monthly payments are not going to be made up then STOP the presses and pay

me in full ASAP."

76.  On October 30, 2014, Mr. Bernard sent a letter by fax to LVG Holding and The

LeonardVincent Group.  He stated: "I would never have invested in TVLG had I known the

earnings or yield was going to zero so soon. . . .  [F]inancial information requested earlier has

never been received, thus my concern."

E.  The Payment Agreement, October 2014

77.  On September 18, 2014, in a letter sent by fax to LVG Holding, Mr. Bernard

proposed a two-year schedule of 24 monthly payments of $25,000, followed by a balloon

payment of the balance of his investment.

78.  LVG Holding accepted Mr. Bernard's proposal in a contract titled "Payment

Agreement" signed by defendant Hudlin on October 31, 2014 (the "Payment Agreement").

79.  The Payment Agreement provides that LVG Holding will pay Mr. Bernard the sum

of $25,000 per month for 24 months, starting on or before December 4, 2014.

80.  Following the last monthly payment, due on or before November 4, 2016, LVG

Holding agreed to make a balloon payment of $994,500 to Mr. Bernard.

81.  The Payment Agreement states that the total amount due to Mr. Bernard by LVG

Holding as of October 31, 2014, was $1,594,500.  This signed admission is binding on

defendants.

82.  LVG Holding agreed to these payment terms in consideration of Mr. Bernard's agreement to forego his right to rescind the subscription agreements and demand immediate payment of $1,594,000.

83.  Although it was signed by Hudlin in his capacity as manager of LVG Holding, the Payment Agreement was faxed to Mr. Bernard in Minnesota from the office of The LeonardVincent Group in New York.

84.  The Payment Agreement is a valid and binding contract under New York law.

F.  Defendants' Breach of the Payment Agreement

85.  As required by the Payment Agreement, defendants paid $25,000 to Mr. Bernard in November 2014.

86.  Defendants breached the Payment Agreement in December 2014 and January 2015 when they failed to make any payment to plaintiffs.

87.  In January 2015, defendants offered to make monthly payments to plaintiffs in the total amount of $16,291.14.  This calculation of interest due was based on a revised principal amount of approximately $1.56 million, including $63,878 in monthly payments that LVG Holding failed to make in 2014.  Mr. Bernard did not accept this offer.

88.  Defendants made this offer after Mr. Bernard spoke directly to defendant Lombardo, representing defendant The LeonardVincent Group.  Defendant Hudlin wrote: "Based upon your discussions with [The LeonardVincent Group], we have decided to reinstate our monthly dividend until such time that the real estate properties have been liquidated and you have been paid in full."  Hudlin added: "No further agreements are necessary as you will be receiving your payments, issued between the 4th and 9th of every month."

89.  Mr. Bernard continued to write to LVG Holding and The LeonardVincent Group in 2015, demanding that defendants make the outstanding interest payments, provide financial statements and liquidate his investment as soon as possible.

90.  On April 28, 2015, in a letter faxed to Mr. Bernard, defendant Brian Hudlin confirmed "various phone communications" between Mr. Bernard and defendant Lombardo.  He concluded: "[W]e are hoping to attain an early resolution for your principal investment through the Real Estate sale and is [sic] asking for your patience in attaining same."

91.  On May 13, 2015, in a letter faxed to Mr. Bernard, defendant Leonard Vincent Lombardo told Mr. Bernard that "with the current properties under contract we expect to have your IRA Funds liquidated in the short term. . . .  [W]e are starting to get a lot of action on the properties, thus bring [sic] us to winding down this portfolio, hopefully sooner than later."  He signed the letter with his alias, "Leonardo Lombardo."

92.  Both of these statements were false when made.  Defendants did not liquidate the IRA account, and they have not sold the real estate portfolio purchased with plaintiffs' funds.

93.  The total amount paid by defendants in 2015, $90,440.00, was far below the amounts due to plaintiffs under the subscription agreements and the Payment Agreement.

94.  Punitive damages are appropriate because defendants engaged in egregious conduct directed at the public generally, including potential investors in New York, Connecticut, Pennsylvania and Minnesota.

<u>FIRST CLAIM FOR RELIEF</u>
Violation of Section 10(b) of the
Securities Exchange Act and S.E.C. Rule 10b-5
Against All Defendants

95.  Plaintiffs reallege and incorporate by reference the allegations made in Paragraphs 1 through 94 of this Complaint.

96.  The Class A Preferred Units and other interests sold to Mr. Bernard by defendants are a "security" or "securities" within the meaning of Sections 3(a)(10) and 10(b) of the Securities Exchange Act, 15 U.S.C. §§ 78c(a)(10), 78j(b), and S.E.C. Rule 10b-5.

97.  Defendants, directly and indirectly, singly and in concert, knowingly or recklessly, by use of the means and instrumentality of interstate commerce or of the mails, in the offer or sale, and in connection with the purchase or sale, of securities, have (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of, or otherwise made untrue statements of material fact, or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchases of securities or other persons.

98.  As part of and in furtherance of this violative conduct, the defendants, directly or indirectly, made the representations alleged in paragraphs 39-68 above.

99.  These representations were material.

100.  The defendants knew that the material misrepresentations and omissions were false or misleading.  They intended that plaintiffs would rely on their misrepresentations and omissions when he decided to purchase interests in LVG Holding.

101.  By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, the defendants have violated Section 10(b) of the Securities Exchange Act and Rule 10b-5.

102.  Plaintiffs reasonably relied on defendants' misrepresentations when they decided to invest their funds in LVG Holding.

103.  As a direct and proximate result of the foregoing violations, plaintiffs have been

injured in an amount to be determined at trial but believed to exceed $1.5 million.

## SECOND CLAIM FOR RELIEF
Breach of Contract – The Subscription Agreements
Against LVG Holding

104.     Plaintiffs reallege and incorporate by reference the allegations made in Paragraphs 1 through 94 of this Complaint.

105.  The subscription agreements between LVG Holding and plaintiffs constitute binding and enforceable contracts under New York law.  LVG Holding agreed to invest funds and make monthly payments to Mr. Bernard and the Trust on the terms described above.

106.  Defendants breached the subscription agreements with plaintiffs by failing to pay interest when due and by failing to return their investment upon reasonable demand.

107.  Plaintiffs fully complied with the requirements of the subscription agreements and performed all of their obligations under those contracts.

108.  As a direct and proximate result of the foregoing breaches, plaintiffs have been injured in an amount to be determined at trial but believed to exceed $1.5 million.

## THIRD CLAIM FOR RELIEF
Breach of Contract – The Payment Agreement
Against LVG Holding

109.  Plaintiffs reallege and incorporate by reference the allegations made in Paragraphs 1 through 94 of this Complaint.

110.   The Payment Agreement between LVG Holding and plaintiffs constitutes a binding and enforceable contract under New York law.  LVG Holding agreed to make payments to Mr. Bernard and the Trust on the terms described above.

111.  Defendants breached the Payment Agreement by failing to make the monthly

payments required thereunder.

112.  Plaintiffs fully complied with the requirements of the Payment Agreement and performed all of their obligations under that Agreement.

113.  As a direct and proximate result of the foregoing breaches, plaintiffs have been injured in an amount to be determined at trial but believed to exceed $1.5 million.

FOURTH CLAIM FOR RELIEF
Fraud
Against All Defendants

114.    Plaintiffs reallege and incorporate by reference the allegations made in Paragraphs 1 through 94 of this Complaint.

115.    Defendants made numerous false statements to plaintiffs, both orally and in writing, and concealed numerous material facts, as alleged in detail above.

116.    Defendants knew at the time they made these false statements and omissions that these statements and omissions were material to plaintiffs.

117.    Defendants acted with the intention to deceive and mislead the plaintiffs, to fraudulently induce them to invest in LVG Holding, and to fraudulently misappropriate and obtain control over the funds that plaintiffs invested with defendants.

118.    Plaintiffs reasonably relied on defendants' statements regarding LVG Holding in deciding to invest their funds.

119.    Both after Mr. Bernard began to ask questions about the security of the funds he invested in LVG Holding, and after he demanded return of plaintiffs' funds, defendants provided a series of bogus excuses for the inability to make timely payments in an attempt to lull plaintiffs into delaying further efforts to recover their funds.  Defendants made these statements in an effort to maintain control of the funds to maximize their personal and corporate profits to

23

plaintiffs' detriment.

120.    At the time defendants made these statements, defendants knew them to be false.

121.    Plaintiffs reasonably relied on defendants' assertions and delayed pursuing legal action for more than one year.

122.    As a direct and proximate result of these fraudulent statements and omissions, plaintiffs have been injured in an amount to be determined at trial but believed to exceed $1.5 million.

<u>FIFTH CLAIM FOR RELIEF</u>
Breach of Fiduciary Duty
Against All Defendants

123.   Plaintiffs reallege and incorporate by reference the allegations made in Paragraphs 1 through 94 of this Complaint.

124.   At all times relevant to this complaint, defendants owed a fiduciary duty to plaintiffs.  Each of the defendants was under a duty to act for plaintiffs and to give them advice concerning the real estate investments made with plaintiffs' money by LVG Holding and The LeonardVincent Group.

125.   Among other things:

a. Defendants Leonard Vincent Lombardo and The LeonardVincent Group held themselves out as experienced real estate investors and consultants who would safeguard plaintiffs' funds and manage them responsibly for plaintiffs' benefit.

b. The individual defendants held themselves out as experienced property managers and investors who had the resources and capability to operate LVG Holding as a professional real estate investment company.

c. Defendants had access to the books and records of LVG Holding that were not accessible to plaintiffs, and made repeated representations to plaintiffs concerning the financial well-being of LVG Holding without disclosing those books and records to the plaintiffs.

126.   Defendants breached their fiduciary duties to plaintiffs by making the material

misrepresentations described above; by failing to disclose and by concealing from plaintiffs material facts concerning their investments; by operating LVG Holding in an unprofessional manner; intermingling funds; failing to keep proper records, prepare annual audited financial statements and file tax returns as required by law; by operating LVG Holding for their own benefit and not for the benefit of their clients; by failing to provide the consulting services and advice to plaintiffs as they promised; and by refusing to pay the funds due and owing to plaintiffs upon demand.

127.  Defendants Leonard Vincent Lombardo and The LeonardVincent Group knowingly directed this breach of fiduciary duty, while defendants Hudlin, Gambino and Lombardi knowingly participated in the breach.

128.  In the alternative, defendants Hudlin, Gambino and Lombardi knowingly aided and abetted the breach of fiduciary duty by defendants LVG Holding, The LeonardVincent Group and Leonard Vincent Lombardo.  Hudlin, Gambino and Lombardi, and each of them, affirmatively assisted the breach of fiduciary duty, helping to conceal it from plaintiffs, failing to prevent it or to notify plaintiffs of the breach, thereby enabling the breach to occur and continue as alleged above.

129.  As a direct and proximate result of this breach of fiduciary duties, plaintiffs have been damaged in an amount to be determined at trial but believed to exceed $1.5 million.

WHEREFORE, plaintiffs respectfully demand judgment against defendants, jointly and severally, as follows:

(a) Awarding plaintiffs compensatory damages in an amount to be determined at trial, but not less than $1.5 million;

(b) Awarding plaintiffs punitive damages in an amount to be determined at trial;

(c) Awarding pre-judgment interest and the costs of this action, including attorney's fees; and

(d) Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand trial by jury.

Dated:  New York, New York
      February 4, 2016

                WILLENS & SCARVALONE LLP

                By:  _____/s/_____
                  Jonathan A. Willens, Esq.
                  Edward Scarvalone, Esq.
                  40 Wall Street, Suite 4100
                  New York, New York 10005
                  Tel:  (646) 200-6333
                  Fax:  (800) 879-7938
                  jawillens@willensscarvalone.com